**UNITED STATES of America**

v.

**Leonard FALZONE, Salvatore "Sammy" Spano, Joseph Sacco, Gasper "Gabby" Cino, Charles Nigro, Defendants.**

**No. Cr–89–141A.**

United States District Court,
W.D. New York.

May 24, 1991.

William J. Knapp, Asst. U.S. Atty., Buffalo, N.Y., for U.S.

Harold J. Boreanaz, Buffalo, N.Y., for defendant Leonard Falzone.

Joseph LaTona, Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, Buffalo, N.Y., for defendant Salvatore "Sammy" Spano.

Joseph DeMarie, Buffalo, N.Y., for defendant Joseph Sacco.

Robert M. Murphy, Buffalo, N.Y., for defendant Gasper "Gabby" Cino.

Joseph Terranova, Buffalo, N.Y., for defendant Charles Nigro.

## DECISION AND ORDER

ARCARA, District Judge.

### INTRODUCTION

The defendants, Leonard Falzone and Salvatore "Sammy" Spano, are charged by indictment with various violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), (d). Defendant Spano is also charged with money laundering and conspiracy to launder money in violation of 18 U.S.C. §§ 1956, 371, respectively, and three counts of filing false tax returns in violation of 26 U.S.C. § 7206.

Defendant Falzone is represented in this action by Mr. Harold Boreanaz, Esq., of the law firm of Boreanaz, Carra and Boreanaz. Defendant Spano is represented by Mr. Paul J. Cambria, Jr., Esq., of the law firm of Lipsitz, Green, Fahringer, Roll, Salisbury and Cambria ("Lipsitz, Green"). The government has moved to disqualify both Mr. Boreanaz and Mr. Cambria. The government argues that disqualification is required because Mr. Boreanaz and Mr. Cambria, either personally or through their respective firms, had prior attorney-client relationships with three of the government's witnesses: Ronald Fino, John "Jack" Fortune and Philip LaRosa.

More specifically, the government alleges that Mr. Cambria had a prior attorney-client relationship with Fino and that members of his firm, Lipsitz, Green, had prior attorney-client relationships with Fortune. The government also argues that Mr. Cambria should be disqualified because a current member of the Lipsitz, Green firm, Mr. Joseph B. Mistrett, Esq., was formerly an Assistant United States Attorney ("AUSA") who assisted LaRosa with his admission into the Federal Witness Protection Program. With regard to Mr. Boreanaz, the government alleges that he had prior attorney-client relationships with both Fino and LaRosa.

Both Fino and Fortune have joined in the government's motion for disqualification. LaRosa, on the other hand, has waived any attorney-client privilege and has declined to join in the government's disqualification motion.

Concerning Fino, the defendants have previously argued that Judge Elfvin's decision in the case of *United States v. Joseph P. Rosato*, Cr. 88–66E, 1989 WL 153790, dated December 7, 1989, denying a similar motion by the government to disqualify both Mr. Boreanaz and Mr. Cambria based on the anticipated testimony of Fino as a government witness, should act as collateral estoppel here. The Court considered this argument separately and, in a decision dated January 24, 1991 (the "Collateral Estoppel Decision"), held that Judge Elfvin's decision in *Rosato* has preclusive effect in

this case with regard to Mr. Boreanaz. Thus, the Court denied the government's motion to disqualify Mr. Boreanaz based on the anticipated testimony of Fino. The Court further found, however, that *Rosato* did not have preclusive effect in this case with regard to Mr. Cambria.

The government has moved the Court to reconsider its Collateral Estoppel Decision as it relates to Mr. Boreanaz. The government, however, has failed to present any new facts or cite any new controlling case law. It simply raises the same arguments that the Court has already considered and rejected. Thus, the government's motion for reconsideration of the Collateral Estoppel Decision is denied.

With regard to the remainder of the disqualification motion, the parties were given ample opportunity to brief their respective positions and a hearing was conducted on November 12, 19 and 26, 1990. After considering the testimony of the witnesses at the hearing, reviewing the exhibits and submissions of the parties and hearing oral argument from counsel, the Court grants the joint-motion to disqualify Mr. Cambria and Lipsitz, Green based on their prior representation of Ronald Fino and Jack Fortune. The Court denies the government's motion to disqualify Mr. Boreanaz.

## STATEMENT OF FACTS

The RICO and RICO conspiracy charges set forth in the indictment cover a period of time from approximately September, 1985 through August, 1989 during which the defendants are alleged to have been members of an enterprise that engaged in the business of collecting unlawful debts, *i.e.*, "loansharking." The unlawful nature of the debts stems from the extremely high interest rates that were charged on the money.

The government asserts that evidence of defendant Spano's efforts to collect payments from various victims will be introduced at trial. Among the victims that the government will call at trial are Philip LaRosa and Jack Fortune. The government also intends to call Ronald Fino as a witness. The government asserts that Fino's

testimony will deal with the criminal relationship between Falzone and Spano.

Fino has filed an affidavit dated September 25, 1990, in which he joins in the government's motion for disqualification. Fortune, during his testimony at the hearing on November 12, 1990, also joined in the government's motion. LaRosa, on the other hand, has declined to join in the government's motion and has waived any attorney-client privilege he may have had with Mr. Boreanaz or Mr. Mistrett.

Mr. Boreanaz has been defendant Falzone's attorney for about 30 years. Mr. Cambria, on the other hand, was retained by Spano specifically for defense of the pending criminal charges. There was no attorney-client relationship between Mr. Cambria and Spano prior to this case. Both Falzone and Spano have made informed waivers of their rights to conflict-free counsel.

### Fino

From 1973 through 1988, Ronald Fino was the business manager for Buffalo Laborers Local 210 (the "Union"). During his tenure as business manager, the Union was represented by the Lipsitz, Green law firm. Fino consulted with Mr. Cambria and various other members of Lipsitz, Green regarding Union business on a regular basis throughout this period. Mr. Cambria also represented Fino during this period in several personal, non-Union civil and criminal matters.

In 1977, Fino retained Mr. Cambria for the purpose of collecting monies owed to Sno–Go, a company with which Fino was associated. The company was allegedly owed monies by the City of Buffalo for snow removal services.

In 1979, Fino retained Mr. Cambria to represent him with regard to a grand jury investigation of Onyx Corporation, a minority business enterprise with which Fino was associated. On November 19, 1981, as a result of this investigation, Fino, along with three other individuals, was indicted for a variety of crimes, including conspiracy, mail fraud, making false statements,

obtaining false bank loans and obstruction of justice. The case went to trial and, on September 28, 1983, a mistrial was declared. The case was retried and, on March 27, 1985, another mistrial was declared. On November 19, 1985, Fino entered a plea of guilty to a misdemeanor conspiracy charge. During this entire period, from the initial investigation in 1979 until the final plea in November, 1985 and the subsequent sentencing, Fino was represented by Mr. Cambria.

Fino testified at the hearing that, in 1980, Mr. Cambria also represented him on a speeding ticket he received in Watertown, New York. Further, Fino discussed problems that he had with the Internal Revenue Service with Mr. Cambria. With regard to this tax matter, however, he was subsequently represented by another attorney in the Lipsitz, Green firm.

In 1982, Fino sought Mr. Cambria's representation with regard to injuries he suffered from a fire occurring in the MGM Grand Hotel in Las Vegas, Nevada. Mr. Cambria referred Fino to an attorney in Las Vegas, Nevada.

Fino was also called as a witness before a federal grand jury in the Western District of New York in the case of *United States v. John R. Catanzaro*, Cr. 88–67. He was represented by Mr. Cambria on this matter. Fino appeared before the grand jury but asserted his Fifth Amendment right not to testify.

During Fino's tenure as the Union's business manager, from 1973 to 1988, he was also serving as an informant for the FBI. He provided the FBI with information concerning Union activities and other criminal matters. Some of this information came from conversations that Fino had with Mr. Cambria and Mr. Boreanaz.

It is noted that a similar motion to disqualify Mr. Boreanaz and Mr. Cambria, based on their prior representation of Fino, was made by the government on behalf of Fino as a prospective witness in the case of *United States v. Rosato*, Cr. 88–66E. As stated earlier, Judge Elfvin denied the government's motion in a Memorandum and Order dated December 7, 1989.

Furthermore, a motion citing similar grounds was made before this Court in the case of *United States v. John R. Catanzaro*, Cr. 88–67A. The Court conducted an extensive hearing on the issue in March, 1989 and became very familiar with the facts relevant to the government's motion. However, the *Cantanzaro* case was transferred to Judge Curtin and resolved by plea without the disqualification motion having been decided.

Finally, another motion to disqualify Mr. Cambria, based on his prior representation of Fino, was made before Judge McAvoy of the Northern District of New York in the case of *United States v. Pavlisak, et al.*, Cr. 89–194, 1990 WL 208705. Judge McAvoy denied the motion in an Order dated December 7, 1990.

### *Fortune*

In late 1986, Jack Fortune retained Mr. Herbert L. Greenman, Esq., in connection with an investigation by the New York State Attorney General's Office relating to Fortune's alleged involvement in a "pyramid sales" scheme known as the "airplane game." Mr. Greenman is a partner of the Lipsitz, Green firm and was associated with the firm during the period he was representing Fortune. Up until 1988, Mr. Greenman, along with Mr. Mark Hoskins, Esq. and Mr. John Murrett, Esq., both of whom were also associated with Lipsitz, Green, continued to represent Fortune in a number of other criminal matters including theft of services involving National Fuel Gas Company and bad check charges. These criminal charges arose from cash flow problems that Fortune was encountering as the operator of the Three Coins Restaurant in Amherst, New York. The victims of the bad checks were suppliers of the restaurant.

During late 1987 and 1988, Fortune was approached by agents of the Federal Bureau of Investigation ("FBI") concerning the activities of Spano. He then agreed to testify before the grand jury in connection with this case and freely discussed the Spano investigation with Mr. Greenman.

Mr. Greenman testified that the files concerning Fortune were kept in or near his office with the rest of his case files. While these files were physically separate from other Lipsitz, Green office files, the cabinets in which they were kept were not locked, were physically accessible to any member of the firm and were part of the firm's central billing system. Fortune's legal fees went to the Lipsitz, Green firm and were shared by all members of the firm, including Mr. Cambria. Mr. Cambria was, and is, the senior partner and supervising attorney for the firm's criminal department and Mr. Greenman's immediate supervisor. Mr. Cambria had unlimited access to all billing information concerning Fortune, including specifics as to services performed and fees charged, as well as physical access to the Fortune files.

Both Mr. Greenman and Mr. Hoskins testified that they had never discussed any of Fortune's cases with Mr. Cambria. Mr. Murrett, in an affidavit dated October 10, 1990, stated that he never discussed his representation of Fortune with Mr. Cambria. Mr. Cambria testified that he never received any information regarding Fortune as a result of the firm's representation of Fortune.

### LaRosa

Philip LaRosa was first represented by Mr. Boreanaz starting in 1964. At that time, Mr. Boreanaz represented LaRosa in connection with a construction accident in which LaRosa was injured. After nearly a decade of representation on that matter, it was finally settled.

In 1982, LaRosa was indicted in the Western District of New York for possessing a quantity of counterfeit money. He was represented on those charges by Mr. Patrick J. Baker, Esq. who was a partner in Mr. Boreanaz's law firm. In 1983, LaRosa pleaded guilty to a misdemeanor in satisfaction of the counterfeiting charges and was placed on probation. Mr. Boreanaz's firm also represented LaRosa in the sale of his personal residence in 1985.

On or about June, 1989, LaRosa sought admission to the Federal Witness Protec-

tion Program on the basis of cooperation that he provided to the government over the previous six years. Mr. Mistrett, who is currently associated with the Lipsitz, Green firm, was the AUSA in charge of assisting LaRosa in entering the Program and met with LaRosa on three different occasions to discuss with him his concerns about the Program and assist him in preparing the necessary paperwork.

### DISCUSSION

#### Attorney–Client Privilege and Duty of Confidentiality

The attorney-client privilege and the attorney's duty of confidentiality of client communications are crucial aspects of our legal system. In order for the system to work effectively, clients must be certain that secrets and confidences that they relay to their attorneys will not be used against them by their attorneys at some later date. As the Supreme Court stated in *Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981):

> The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law. Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of the law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client.... The lawyer-client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for representation if the professional mission is to be carried out.

*Id.* at 389, 101 S.Ct. at 682 (citations omitted).

The necessity of an attorney's duty of strict confidentiality of attorney-client communications is reflected in the American Bar Association Code of Professional Responsibility (the "Code"). Under Canons 4 and 9 of the Code, an attorney is obligated

to "preserve the confidences and secrets of a client" and to "avoid even the appearance of professional impropriety." The Second Circuit, in *Emle Indus. v. Patentex, Inc.,* 478 F.2d 562 (2d Cir.1973), outlined the reasoning behind Canon 4:

Canon 4 implicitly incorporates the admonition embodied in old Canon six, that "the [lawyer's] obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed." Without strict enforcement of such high ethical standards, a client would hardly be inclined to discuss his problems freely and in-depth with his lawyer, for he would justifiably fear that information that he reveals to his lawyer on one day may be used against him on the next. A lawyer's good faith, although essential in all his professional activity, is nevertheless an inadequate safeguard when standing alone. Even the most rigorous self-discipline might not prevent a lawyer from unconsciously using or manipulating a confidence required in the early representation and transforming it into a telling advantage in the subsequent litigation. Or, out of an excess of good faith, a lawyer might bend too far in the opposite direction, refraining from seizing a legitimate opportunity for fear that such a tactic might give rise to an appearance of impropriety. In neither event, would the litigants or the public's interest be well served. The dynamics of litigation are far too subtle, the attorney's role in that process is far too critical, and the public's interest in the outcome is far too great to leave room for even the slightest doubt concerning the ethical propriety of a lawyer's representation in a given case. These considerations require application of a strict prophylactic rule to prevent any possibility, however slight, that confidential information acquired from a client during a previous relationship may subsequently be used to the client's disadvantage.

*Id.* at 571.

The duty of confidentiality of a client's communications is imputed to all members of a law firm. CODE OF PROFESSIONAL RESPONSIBILITY DR 5–105(D) [1]; *see Cheng v. GAF Corp.,* 631 F.2d 1052, 1056 (2d Cir.1980), *vacated on other grounds,* 450 U.S. 903, 101 S.Ct. 1338, 67 L.Ed.2d 327 (1981); *Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225, 232 (2d Cir.1977); *Cinema 5, Ltd. v. Cinerama, Inc.,* 528 F.2d 1384, 1387 (2d Cir.1976). There is a rebuttable presumption that confidential client communications are shared by all members of a law firm. *E–Z Paintr Corp. v. Padco, Inc.,* 746 F.2d 1459, 1461 (Fed.Cir.1984); *NCK Org., Ltd. v. Bregman,* 542 F.2d 128, 134 (2d Cir.1976); *Silver Chrysler Plymouth, Inc. v. Chrysler Motor Corp.,* 518 F.2d 751, 754 (2d Cir.1975), *overruled on other grounds, Armstrong v. McAlpin,* 625 F.2d 433 (2d Cir.1980). Furthermore, the attorney's duty of confidentiality continues even after termination of the attorney-client relationship. CODE OF PROFESSIONAL RESPONSIBILITY EC 4–6 [2]; *Int'l Elec. Corp. v. Flanzer,* 527 F.2d 1288, 1291 (2d Cir.1975).

Obviously, the attorney-client privilege hinges upon the existence of an attorney-client relationship. The party claiming the protection of the attorney-client privilege has the burden of establishing those facts that are the essential elements of an attorney-client relationship. *United States v. Schwimmer,* 892 F.2d 237, 244 (2d Cir. 1989); *von Bulow by Auersperg v. von Bulow,* 811 F.2d 136, 146 (2d Cir.), *cert. denied,* 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987).

---

1. DR 5–105(D) states in pertinent part:

 While lawyers are associated in a law firm, none of them shall knowingly accept or continue employment when any one of them practicing alone would be prohibited from doing so [under the Code] except as otherwise provided therein.

2. EC 4–6 states that "[t]he obligation to protect confidences and secrets of clients continues after termination of employment."

The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney is informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir.1982) (*quoting United States v. United Shoe Mach. Corp.*, 89 F.Supp. 357, 358–59 (D.Mass.1950)).

*Conflict Between Defendant's Right to Counsel of Choice and Former Client's Attorney–Client Privilege*

 It is well settled that a defendant in a criminal case has an absolute right under the Sixth Amendment to be represented by an attorney who is free from any conflict of interest. *Holloway v. Arkansas*, 435 U.S. 475, 484, 98 S.Ct. 1173, 1178, 55 L.Ed.2d 426 (1978); *Glasser v. United States*, 315 U.S. 60, 71, 62 S.Ct. 457, 465, 86 L.Ed. 680 (1942). This right is directly related to a criminal defendant's Sixth Amendment right to effective assistance of counsel. It is also clear that a criminal defendant has a qualified right to representation by counsel of his choice. *Morris v. Slappy*, 461 U.S. 1, 21–23, 103 S.Ct. 1610, 1621–1622, 75 L.Ed.2d 610 (1983). A conflict arises when, as here, defendant's counsel of choice may have, or at least appear to have, a conflict of interest arising from his prior representation of a client who is now a government witness appearing against the defendant. *See, e.g., United States ex rel. Stewart on behalf of Tineo v. Kelly*, 870 F.2d 854 (2d Cir.1989); *United States v. O'Malley*, 786 F.2d 786 (7th Cir.1986); *United States v. Iorizzo*, 786 F.2d 52 (2d Cir.1986); *United States v. Cunningham*, 672 F.2d 1064 (2d Cir.1982);

*cf. United States v. James*, 708 F.2d 40 (2d Cir.1983).

The crux of the conflict is obvious. The defendant's attorney is under an ethical obligation to represent zealously the defendant. *See* CODE OF PROFESSIONAL RESPONSIBILITY Canon 7. In a criminal trial, defense counsel's most important function is to vigorously cross-exam the government's witnesses. However, when one of the government's witnesses is a former client, defense counsel's ethical obligations may conflict. On the one hand, he is under a duty to represent zealously the defendant, while on the other hand, he has a duty of confidentiality to his former client, the government witness. *See Stewart*, 870 F.2d at 857. To limit cross-examination of the former client to matters in the public record may prejudice the defendant if more searching inquiries are necessary for complete evaluation of the testimony against the defendant. Alternatively, if cross-examination is not limited, there may be an intrusion into the former client's attorney-client privilege if competent cross-examination would necessarily delve into matters not part of the public record. *Id.*

When this type of situation arises, the defendant can effectively waive his right to conflict-free counsel. *Cunningham*, 672 F.2d at 1073. Any such waiver of counsel must not only be voluntary, but also must be a knowing and intelligent relinquishment of his right to a conflict-free attorney. *United States v. Curcio*, 680 F.2d 881, 888 (2d Cir.1982) (citations omitted). Before granting such a waiver, "the court should advise the defendant of his right to separate and conflict-free representation, instruct the defendant as to the problems inherent in being represented by an attorney with divided loyalties, allow the defendant to confer with chosen counsel, encourage defendant to seek advice from independent counsel, and allow a reasonable time for the defendant to make his decision." *Id.* at 890. Failure to follow these procedures could make the waiver invalid. *Id.* Here, both Falzone and Spano have made voluntary, knowing and intelligent waivers of their rights to conflict-free counsel.

However, even if a defendant knowingly and intelligently waives his Sixth Amendment right to conflict-free counsel, this does not resolve the conflict posed by the duty of confidentiality that his attorney may still owe to the government witness appearing against him. The right of a criminal defendant to be represented by counsel of his choice is not absolute. *Wheat v. United States*, 486 U.S. 153, 159–60, 108 S.Ct. 1692, 1697–98, 100 L.Ed.2d 140 (1988). Instead, the trial court must balance the defendant's right to counsel of his choice with the same defendant's right to a fair trial. *Stewart*, 870 F.2d at 856. While there is a presumption in favor of defendant's counsel of choice, "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that the legal proceedings appear fair to all who observe them." *Wheat*, 486 U.S. at 160, 108 S.Ct. at 1697. Thus, the presumption in favor of a defendant's counsel of choice may be overcome by either "a demonstration of actual conflict" or "by a showing of a serious potential for conflict," despite defendant's waiver of conflict-free counsel. *Id.* at 164, 108 S.Ct. at 1699. The trial court must evaluate the interests of the defendant, the government, the witness and the public in view of the circumstances of the particular case and perform a "balancing test" to determine if there is either an actual conflict or a serious potential for conflict requiring disqualification. *James*, 708 F.2d at 44; *Cunningham*, 672 F.2d at 1070 ("In determining whether the right of the accused to counsel of his choosing should be honored in a particular case, [the court] must balance the defendant's constitutional right against the need to preserve the highest ethical standards of professional responsibility.").

After performing the "balancing test" in the instant case, the Court finds that Mr. Cambria's prior representation of Fino, and the Lipsitz, Green firm's prior representation of Fortune, creates a serious potential for conflict requiring the disqualification of Mr. Cambria and the Lipsitz, Green firm from this case. With regard to Mr. Boreanaz, the Court finds that his prior representation of LaRosa does not create a serious potential for conflict and, therefore, disqualification is not required.

### Fino

The government, along with Fino, has moved for disqualification of Mr. Cambria and Lipsitz, Green due to Mr. Cambria's prior attorney-client relationship with Fino. As a threshold matter, the Court must determine whether there actually existed an attorney-client relationship between Mr. Cambria and Fino. Since the government and Fino are asserting the attorney-client privilege, the burden is on them to establish that an attorney-client relationship existed. *Schwimmer*, 892 F.2d at 244. After considering the testimony at the hearing and reviewing the exhibits, the Court finds that there existed an attorney-client relationship between Mr. Cambria and Fino spanning some twelve years, from 1977 to 1988. During this time, Mr. Cambria represented Fino on a number of personal matters, both civil and criminal.

Mr. Cambria asserts that, even if there was an attorney-client relationship between himself and Fino, Fino never relayed to him any confidential communications and, therefore, he owes no duty of confidentiality to Fino. The Court finds that this assertion strains credulity. Mr. Cambria represented Fino in a variety of criminal and civil matters spanning a period of some twelve years. It is difficult to believe that during that entire period, Fino never relayed confidential information to Mr. Cambria. Fino certainly believes that there were protected confidential communications as he has joined in the government's disqualification motion in order to protect his attorney-client privilege. Thus, for the purposes of this motion, the Court will assume that there were confidential communications between Mr. Cambria and Fino during their attorney-client relationship.

Mr. Cambria further argues that, even if an attorney-client relationship existed between himself and Fino, the attorney-client privilege has been waived by Fino's cooperation with the FBI. In *James*, the defen-

dants also argued that the witness waived his attorney-client privilege by making disclosures to the government. The Second Circuit held that "in so far as questioning of the client is concerned, '[t]he privilege attaches not to the information but to the communication of the information.' " *James*, 708 F.2d at 44 n. 3 (*quoting Cunningham*, 672 F.2d at 1073 n. 8). "In other words, a client does not waive his attorney-client privilege merely by disclosing a subject that he had discussed with his attorney. In order to waive the privilege, the client must disclose the communication with the attorney itself." *O'Malley*, 786 F.2d at 794. After reviewing the exhibits,[3] the Court finds that Fino only relayed information to the FBI; he did not disclose the actual communications that he had with Mr. Cambria. The fact that Fino was cooperating with the FBI does not, by itself, suggest that he disclosed any privileged communications. *Id.* (*citing James*, 708 F.2d at 44 n. 3). Thus, the Court finds that there was no waiver of Fino's attorney-client privilege.

Having determined that an actual attorney-client relationship existed between Fino and Mr. Cambria, the Court must next evaluate the interests of the defendant, the witness, Fino, the government and the public and perform a "balancing test" in order to determine if disqualification is warranted.

First, the trial court must consider the possible prejudice to the defendant if disqualification is granted. In this case, Mr. Cambria and Spano do not have a longstanding attorney-client relationship. In fact, Spano never retained Mr. Cambria's services prior to this action. Thus, Spano does not have a strong interest in having Mr. Cambria, as opposed to another competent attorney, represent him in this case.

Further, this action is not so far along that a new attorney could not be retained by Spano and provide effective assistance of counsel. Because there are a number of outstanding motions yet to be resolved, the trial of this case will not occur for several months. Thus, a new attorney would have sufficient time to become familiar with the case and be prepared adequately to represent Spano at trial.

The Court notes with concern, however, the government's delay in bringing this disqualification motion. The indictment in this case was filed on August 23, 1989. Over the next several months, defense counsel filed various discovery, suppression and severance motions. However, it was not until June 15, 1990, after about ten months of extensive discovery, that the government informed the Court by letter that it was contemplating filing a disqualification motion. The actual motion was not filed until July 16, 1990. Certainly, the government had a fairly clear idea of whom its witnesses would be in this case prior to the indictment. It is difficult to understand, therefore, why there was such a delay in bringing this disqualification motion. The Court finds, however, that this delay has not prejudiced the defendant.

Furthermore, the Court is not unmindful of the possibility that the government may be attempting to "manufacture" a conflict in order to prevent Spano from having a particularly able defense counsel at his side. *Wheat*, 486 U.S. at 163, 108 S.Ct. at 1699. However, the Court finds that the disqualification motion in this case has a good faith basis and was not brought for the improper purpose of depriving Spano of competent counsel.

Next, the Court must evaluate the interest of the witness, Fino. It is significant that Fino has joined in the government's disqualification motion. *James*, 708 F.2d at 45. It means that he views the risk of an intrusion into his attorney-client privilege as substantial enough to seek disqualification. This view is not unsupported by the history of Mr. Cambria's representation of Fino. Over a twelve year period, Mr. Cambria represented Fino in a number of matters, both criminal and civil, and was certainly privy to confidential communica-

---

**3.** The exhibits are FBI 302's consisting of summaries of interviews between FBI agents and Fino.

tions from Fino. "This circumstance in itself strongly suggests the granting of the disqualification motion." *Id.*

[D]isqualification motions should be granted where the attorney in question is potentially in a position to use privileged information obtained during prior representation of the movant.... Disqualification of counsel in such cases is rooted in notions of fundamental fairness; allowing an attorney to represent a client in a situation where he may use information obtained in the course of former representation of the client's adversary gives the client an unfair advantage.

*Cunningham,* 672 F.2d at 1072 (citations omitted). Thus, the Court finds that Fino has a very strong interest in the disqualification of Mr. Cambria.

Furthermore, the Court will not be able adequately to safeguard Fino's interest in maintaining his attorney-client privilege if Mr. Cambria remains as Spano's attorney. During this trial, Fino's credibility will certainly be attacked during cross-examination. While Spano and Mr. Cambria argue that there is sufficient information in the public record to impeach Fino's credibility without having to resort to confidential communications from Fino, it would be extremely difficult, if not impossible, for the Court and the public to differentiate between the information that is part of the public record and the information that Mr. Cambria learned through his attorney-client relationship with Fino. The Court is in no way implying that Mr. Cambria would ever intentionally breach his duty of confidentiality to Fino. However, "[e]ven the most rigorous of self-discipline might not prevent a lawyer from unconsciously using or manipulating a confidence acquired in the earlier representation and transforming it to telling advantage in the subsequent litigation." *Emle Indus., Inc.,* 478 F.2d at 571. Moreover, to limit cross-examination of Fino to matters in the public record may prejudice Spano by denying him his right to thorough cross-examination of the government's witnesses. *Stewart,* 870 F.2d at 857. Thus, the Court finds that, as a practical matter, if Mr. Cambria was allowed to remain in the case, it would be very diffi-cult, if not impossible, for the Court adequately to safeguard Fino's attorney-client privilege while also ensuring Spano a fair trial.

Mr. Cambria pointed out during oral argument that when Fino testified in the *Rosato* case, his attorney-client privilege never became an issue. Here, however, there are different defendants who are charged with crimes completely different from those charged against Rosato. The testimony of the government witnesses, and Fino in particular, will necessarily be different from that offered in *Rosato.* Consequently, cross-examination and implication of Fino's attorney-client privilege could be different, at least to some degree, as well.

Mr. Cambria further argues that disqualification is not warranted in this case because there is no "substantial relationship" between the subject matter of his prior representation of Fino and the issues present in this case. The Court, however, rejects this argument.

The Court is not convinced that there must be a "substantial relationship" between the subject matter of the prior representation and the issues in the present case before disqualification is warranted. The "substantial relationship" test seems to intimate that a trial court must find that there is an actual conflict of interest before disqualification is warranted. However, the Supreme Court in *Wheat* held that the trial court "must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict of interest may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Wheat,* 486 U.S. at 163, 108 S.Ct. at 1699.

Further, the Second Circuit, in *Stewart,* recently held that disqualification of a criminal defendant's attorney was warranted when the attorney had a prior attorney-client relationship with a government witness, even though the subject matter of the prior representation and the issues present-

ed in the defendant's case were unrelated. *Stewart*, 870 F.2d at 857. The court stated that:

It is hard to conceive of a conflict of interest between two clients that could not be serious ... [T]here can be no doubt that [defense counsel's] potential conflict was serious, that his loyalty was divided between a client and a former client, and that representing [the defendant] would have created a strong appearance of impropriety. This is no less true simply because [defense counsel's] representation of the clients did not concern the same matter, as was the case in *Wheat*. Two client's interests in separate matters may be just as opposed, and the potential for conflict just as serious.

*Id.* (citations omitted). Thus, the Court finds that there need not be a "substantial relationship" between the subject matter of the prior representation and the issues in the present case before disqualification is warranted. All that is required is that the interest of the defendant potentially conflicts with the interest of the former client.

Even if the Court were to assume that a "substantial relationship" is required before disqualification is warranted, the Court finds that a "substantial relationship" exists in this case. Mr. Cambria represented Fino in a number of criminal matters over a twelve year period from 1977 to 1988. The government has asserted that Fino will testify about the criminal relationship between Falzone and Spano as it relates to their alleged "loansharking" enterprise. It is certainly possible, if not probable, that Fino came about this information concerning defendants Falzone and Spano during the course of his own criminal activity.

It is difficult, however, for the Court to determine whether Fino ever discussed defendants Falzone or Spano, or any related criminal activity, with Mr. Cambria since "[o]nly the client and the attorney know what confidential communications occurred." *James*, 708 F.2d at 46. Thus, "[t]he assessment of the fairness of the attorney's questioning of a former client

must depend in large part on the view of the client." *Id.*

Since Fino has joined in the government's disqualification motion, he must be concerned that confidential communications made by him during the course of his prior relationship with Mr. Cambria may be used against him by Mr. Cambria in this case. Thus, in Fino's view, the subject matter of the prior representation and the issues present in this case are substantially related.

Further, as stated earlier, Fino's credibility definitely will be an issue in this case and the numerous criminal matters in which Mr. Cambria represented Fino may be used by defendants to impeach Fino's credibility on cross-examination. Thus, in view of all the circumstances, the Court finds that there is a "substantial relationship" between Mr. Cambria's prior representation of Fino and the issues present in this case.

Finally, the Court must evaluate the interests of the government and the public. "The government has an interest in protecting its witnesses from tactics that are unfair; the public's interest in having trials conducted fairly demands no less on behalf of any witness." *James*, 708 F.2d at 46. Further, the Court has "an independent duty to ensure that criminal defendants receive a trial that is fair." *Wheat*, 486 U.S. at 160, 108 S.Ct. at 1697. In this case, the Court finds that it would be unfair to the government and Fino to allow Mr. Cambria to remain in the case. Mr. Cambria may have received confidential information from Fino during the course of their attorney-client relationship, and it would be unfair to allow him to use that information, either purposely or inadvertently, during a cross-examination of Fino at trial. "[E]ven the constitutional dimension of a criminal defendant's right to counsel of his choice does not give the defendant the right to take advantage of his preferred attorney's confidential knowledge gained from prior representation of the witness." *James*, 708 F.2d at 46. In addition, if it were to become known to the jury that Mr. Cambria was formerly Fino's attorney, the jury

might give undue weight to Mr. Cambria's attack on Fino's credibility during his opening statement, his cross-examination of Fino, and his summation.

Furthermore, the "need to investigate potential conflicts arises in part from the legitimate wish of [trial courts] that their judgments remain intact on appeal." *Wheat*, 486 U.S. at 161, 108 S.Ct. at 1698. As the *Wheat* Court pointed out, trial courts faced with possible conflicts of interest face the prospect of being "whipsawed" by assertions of error no matter which way they decide. If the trial court grants the disqualification motion, then the defendant can appeal on the ground that he was denied counsel of choice. If, on the other hand, the trial court accepts the defendant's waiver of conflict-free counsel and the defendant is convicted, he may still appeal on the ground that he was denied effective assistance of counsel because his attorney had a conflict. *Id.* at 161–62, 108 S.Ct. at 1698–99.

> Unfortunately for all concerned, a district court must pass on the issue of whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in a murkier pre-trial context when the relationships between the parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials.

*Id.* at 162–63, 108 S.Ct. at 1698–99. Thus, the Court concluded, district courts "must be allowed substantial latitude in refusing waivers of conflict of interests . . . ." *Id.* at 163, 108 S.Ct. at 1699.

Moreover, the Court and the public have a strong interest in protecting Fino's attorney-client privilege. As stated earlier, in order for our legal system to function properly, clients must be sure that the secrets and confidences that they relay to their attorneys will be kept confidential. This duty of confidentiality is essential if clients are to cooperate fully with their attorneys when seeking advice. In this case, while

Spano has a qualified right to his counsel of choice, Fino has an important interest in maintaining his attorney-client privilege. "The integrity of our system of justice demands that the interests of all concerned be accommodated as fairly as possible." *James*, 708 F.2d at 46. The Court finds that the only way it can preserve the integrity of the justice system in this case is to disqualify Mr. Cambria.

In sum, the Court finds that, after weighing the interests of the defendant, the witness, the government and the public, there exists a serious potential for conflict based on Mr. Cambria's prior representation of Fino. Thus, the Court grants the joint-motion for disqualification of Mr. Cambria and Lipsitz, Green based on Mr. Cambria's prior representation of Fino.

### *Fortune*

■ The government has also moved for disqualification of Mr. Cambria and Lipsitz, Green based on his firm's prior representation of the government witness Jack Fortune. While Mr. Cambria never personally had an attorney-client relationship with Fortune, it is clear from the record that Mr. Greenman, one of Mr. Cambria's partners in the Lipsitz, Green firm, and Mr. Murrett and Mr. Hoskins, both of whom were formerly with Lipsitz, Green, had prior attorney-client relationships with Fortune. Even though Fortune is a former client, Mr. Greenman, Mr. Murrett and Mr. Hoskins still have a duty of confidentiality concerning any confidential communications made to them by Fortune during the course of their representation of him. CODE OF PROFESSIONAL RESPONSIBILITY EC 4–6. This duty of confidentiality is imputed to all members of the Lipsitz, Green firm, including Mr. Cambria. CODE OF PROFESSIONAL RESPONSIBILITY DR 5–105(D); *Cinema 5, Ltd.*, 528 F.2d at 1387.

As with Fino, the Court must evaluate the interests of the defendant, the witness, Fortune, the government, and the public and perform a "balancing test" to determine if disqualification is warranted. *See*

*James,* 708 F.2d at 40; *Cunningham,* 672 F.2d at 1064.

First, the Court must consider the possible prejudice to the defendant if disqualification is granted. As discussed with regard to Fino, the Court finds that while there is a presumption in favor of counsel of choice, Spano will not be prejudiced if Mr. Cambria is disqualified. Spano does not have a longstanding attorney-client relationship with Mr. Cambria and the case is not so far along that a new, competent attorney could not provide effective assistance of counsel.

Next, the Court must evaluate the interest of the witness, Fortune. It is significant that Fortune has joined in the government's motion for disqualification. *James,* 708 F.2d at ... . It means that he views the risk of an int... usion into his attorney-client privilege as substantial enough to seek disqualification. This view is supported by the fact that there is a "substantial relationship" between the subject matter of Lipsitz, Green's prior representation of Fortune and the issues in this case.

From 1986 until 1988, Mr. Greenman, Mr. Murrett and Mr. Hoskins represented Fortune in a number of criminal matters arising from cash flow problems that he was encountering as operator of the Three Coins Restaurant. These criminal matters involved theft of services involving National Fuel Gas and bad check charges. The victims of the bad checks were suppliers of the restaurant.

Further evidence of Fortune's financial difficulties is the fact that he was implicated in a "pyramid sales" scheme allegedly being run out of his restaurant. Mr. Greenman represented him during an investigation of this matter by the New York State Attorney General's Office.

The government alleges that it was during this period of financial difficulty that Fortune turned to Spano to borrow money at unlawful interest rates. The government asserts that Fortune will testify that, because he was unable to get credit from any legitimate source due to his previous financial difficulties, he borrowed money from Spano in order to keep his restaurant open.

During late 1987 and 1988, Fortune was approached by agents of the FBI concerning the alleged "loansharking" activities of Spano. He then testified before the grand jury in connection with this case. During this period, Fortune discussed the Spano investigation with Mr. Greenman.

In view of these facts, the Court finds that there is a "substantial relationship" between the subject matter of Lipsitz, Green's prior representation of Fortune and the issues in the present case. The prior representation dealt with criminal matters arising out of Fortune's financial difficulties. His testimony in the instant case will deal with how he was allegedly victimized by Spano's "loansharking" enterprise as a result of his financial difficulties. Furthermore, Fortune even discussed the Spano investigation with Mr. Greenman.

Because there is a "substantial relationship" between Lipsitz, Green's prior representation of Fortune and the issues present in this case, the Court finds that Fortune has a legitimate concern that there may be an intrusion into his attorney-client privilege when he testifies at trial. It would be unfair to Fortune and the government for the Court to allow cross-examination of Fortune by a member of the Lipsitz, Green firm concerning matters such as Fortune's prior criminal and financial difficulties, his knowledge of Spano's illegal activities, his participation in the FBI investigation and his grand jury testimony in this case, when all of these matters occurred at the same time he was being represented by Lipsitz, Green in substantially related matters. In view of this, Mr. Cambria's assertion in his brief that "even Mr. Greenman could represent Mr. Spano" is obviously wrong.

Mr. Cambria argues that, even if there is a "substantial relationship" between the subject matter of the prior representation and the issues in the present case, he should not be disqualified because he was never exposed to any confidential information regarding Fortune. However, Mr. Greenman, Mr. Murrett and Mr. Hoskins'

duty of confidentiality is imputed to all members of the Lipsitz, Green firm, including Mr. Cambria. *See Cheng*, 631 F.2d at 1056; *Fund of Funds, Ltd.*, 567 F.2d at 235–36; *Cinema 5, Ltd.*, 528 F.2d at 1387. There is a rebuttable presumption that Mr. Cambria was exposed to confidential communications made by Fortune to other members of the Lipsitz, Green firm. *See E–Z Paintr Corp.*, 746 F.2d at 1461; *NCK Org., Ltd.*, 542 F.2d at 134.

After considering the testimony at the hearing and reviewing the submissions of the parties, the Court finds that Mr. Cambria has rebutted the presumption that he was exposed to confidential matters relating to Fortune. Mr. Cambria, Mr. Greenman, Mr. Hoskins testified, and Mr. Murrett stated in an affidavit, that Mr. Cambria never had any contact with matters involving Fortune. The Court further finds, however, that allowing Mr. Cambria to remain in this case would create an unacceptable appearance of impropriety and possibly taint the underlying trial.

Mr. Cambria was, and still is, the senior partner and supervising attorney of Lipsitz, Green's criminal department and was Mr. Greenman's immediate supervisor while he was representing Fortune. While Mr. Cambria did not directly represent Fortune, he was indirectly responsible for Fortune's representation. As head of Lipsitz, Green's criminal department, Mr. Cambria sets the department's policies and procedures and has ultimate supervisory control over all of the firm's criminal cases, including Fortune's. As a partner in the firm, Mr. Cambria shares in all client fees, including those paid by Mr. Fortune. Thus, the Court finds that Fortune, as a client of Lipsitz, Green's criminal department, should be able to expect the same loyalty from Mr. Cambria as he expects from Mr. Greenman.

Further, Lipsitz, Green has not, to this day, put in place any sort of mechanism, such as a "chinese wall," to screen Mr. Cambria from matters involving Fortune. While Mr. Greenman is not actively involved in the instant case, the Lipsitz, Green firm is a relatively small firm with an even smaller criminal department. Despite Mr. Cambria's protestations, it is unclear to the Court how disclosures, admittedly inadvertent, can be prevented throughout the course of Mr. Cambria's representation of Spano. Because of the small size of the criminal department and the absence of a "chinese wall," there is a continuing danger that Mr. Greenman may unintentionally transmit information that he gained through his prior representation of Fortune during his day-to-day contact with Mr. Cambria. *See Cheng*, 631 F.2d at 1058.

Thus, the Court finds that, even though Mr. Cambria was not exposed to any confidential communications regarding Fortune, the appearance of impropriety created by his presence in this case and the danger of inadvertent disclosure requires his disqualification. *See Cheng*, 631 F.2d at 1058–59; *Cinema 5, Ltd.*, 528 F.2d at 1387; *cf. Emle Indus., Inc.*, 478 F.2d at 565 (where public confidence in the Bar would be undermined, "even an appearance of impropriety requires prompt remedial action by the court.").

Lastly, the interests of the government and the public are the same as they were in the Court's earlier analysis regarding Fino. Both the government and the public have an interest in: (1) a fair trial for Spano; (2) protecting witnesses from unfair tactics; and (3) protecting Fortune's attorney-client privilege. *See James*, 708 F.2d at 46. Further, the Court has an interest in striving to keep its judgments intact on appeal. *Wheat*, 486 U.S. at 161, 108 S.Ct. at 1698.

The Court notes a recent state court case involving Mr. Cambria and a similar set of circumstances. In *New York v. Liuzzo*, App.Div., 562 N.Y.S.2d 303 (N.Y.App.Div. 4th Dept.1990), the appellate court affirmed the trial court's disqualification of Mr. Cambria and the Lipsitz, Green firm based on the firm's prior representation of a government witness. In that case, Mr. Cambria represented several defendants against charges arising from a Department of Social Services audit. Mr. Cambria's firm formerly represented a state Department of Social Services auditor against allegations of misconduct in connection with

the same audit. The auditor was to be a key prosecution witness.

The appellate court held that:

The duty of loyalty to a former client is broader than the attorney-client privilege and an attorney is not free to attack a former client with respect to the subject matter of the earlier representation even if the information used in the attack comes from sources other than the former client. Although the [defendants] purported to waive any conflict of interest and agreed that Cambria would limit cross-examination of the [former client], who was expected to be a key prosecution witness at trial, the [former client] did not waive the conflict. The [former client's] right to Cambria's loyalty cannot be waived by the [defendants]. The disqualification of Cambria was a reasonable exercise of the trial court's discretion, because an individual's right to counsel of his own choice must yield to an overriding competing public interest. The overriding public interest here is the court's duty to protect the integrity of the justice system and preserve the ethical standards of the profession.

*Id.* at 304 (citations omitted). While the Court is not bound by this decision, it finds the *Liuzzo* decision persuasive because state and federal courts apply the same ethical standard, the Code of Professional Responsibility.

In sum, the Court finds that after weighing the interests of the defendant, the witness, the government and the public, there exists a serious potential for conflict based on Lipsitz, Green's prior representation of Fortune. Thus, the Court grants the joint-motion to disqualify Mr. Cambria and Lipsitz, Green.

The Court notes that Lipsitz, Green's prior representation of Fortune provides an independent ground for disqualifying Mr. Cambria. When combined with Mr. Cambria's prior representation of Fino, however, it leaves no doubt that disqualification is warranted in this case.

### LaRosa

The government has also moved to disqualify Mr. Cambria and Lipsitz, Green based on the fact that a current member of the Lipsitz, Green firm, Mr. Mistrett, was formerly an AUSA who assisted LaRosa with his admission into the Federal Witness Protection Program. DR 9–101(B)(2) provides that:

A lawyer having information that the lawyer knows is confidential government information about a person, acquired when the lawyer was a public officer or employee, may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person. A firm with which that lawyer is associated may knowingly undertake or continue representation in the matter only if the disqualified lawyer is effectively screened from any participation, direct or indirect, including discussion, in the matter and is apportioned no part of the fee therefrom.

After considering the testimony at the hearing and reviewing the submissions of the parties, it is unclear to the Court exactly what information Mr. Mistrett learned during his contact with Fortune while at the United States Attorney's Office and whether Lipsitz, Green has taken any active measures to screen Mr. Mistrett from any contact with this case. In light of the Court's decision regarding Fino and Fortune, however, the Court need not decide the government's motion with regard to Mr. Mistrett's prior relationship with LaRosa.

■ The government also has moved to disqualify Mr. Boreanaz based on his prior representation of LaRosa. While the Court finds that there was a prior attorney-client relationship between Mr. Boreanaz and LaRosa, disqualification is not required in this instance.

There are two factors that weigh heavily against disqualification of Mr. Boreanaz. First, and perhaps most importantly, LaRosa has not joined in the government's disqualification motion and has waived his attorney-client privilege. Consequently, there is no potential for conflict because Mr. Boreanaz has been released from any ethical obligations that he may have still owed to LaRosa. *See Cunningham*, 672 F.2d at 1072. Second, Mr. Boreanaz has

represented defendant Falzone for some 30 years. This fact weighs heavily in favor of defendant Falzone's counsel of choice. *Id.* at 1070–71. Thus, the Court denies the government's motion to disqualify Mr. Boreanaz based on his prior representation of LaRosa.

### CONCLUSION

For the reasons stated, the Court grants the joint-motion to disqualify Mr. Cambria and Lipsitz, Green based on Mr. Cambria's prior representation of Fino and Lipsitz, Green's prior representation of Fortune. The Court denies the government's motion to disqualify Mr. Boreanaz. Further, the Court denies the government's motion for reconsideration of the Court's Collateral Estoppel Decision. The Court also orders that Mr. Boreanaz, on behalf of Leonard Falzone; Mr. Joseph DeMarie, Esq., on behalf of Joseph Sacco; Mr. Joseph Terranova, Esq., on behalf of Charles Nigro; and Mr. Robert Murphy, Esq., on behalf of Gasper Cino, appear in Part II of this Court at 9:30 a.m., Monday, June 3, 1991, for purposes of a scheduling conference for final disposition of all pending motions. Salvatore Spano is also ordered to appear at this conference with new counsel.

It is so ordered.