UNITED STATES of America,

v.

Robert J. GEHL, George Jackson, Tempo-
tech Industries, Inc.; and Gehl Pro-
ductions, Inc., Defendants.

No. 93–CR–300.

United States District Court,
N.D. New York.

May 13, 1994.

**1136**

Gary L. Sharpe, U.S. Atty., Syracuse, NY (Craig Ben, Asst. U.S. Atty., of counsel), for U.S.

Bond Schoeneck & King, Syracuse, NY (George H. Lowe, of counsel), for defendant Jackson.

Honigman Miller Law Firm, Detroit, MI (Richard E. Zuckerman, Cindy Thomas, of counsel), for defendants Robert Gehl, Tempotech & Gehl Productions.

## MEMORANDUM–DECISION AND ORDER

McCURN, Senior District Judge.

### INTRODUCTION

The first part of the indictment in this case charges the defendants, Robert J. Gehl, Tempotech Industries, Inc., Gehl Productions, Inc. (collectively referred to throughout as "the Gehl defendants") and George Jackson with violating the Lacey Act Amendments of 1981, 16 U.S.C. § 3371 *et seq.*, by selling for human consumption salmon eggs from certain New York State waters allegedly in contravention of 6 N.Y.C.R.R. § 37.1.[1] The second part of the indictment, pertaining only to the Gehl defendants, alleges that they engaged in illegal financial structuring in connection with this caviar business, in violation of 31 U.S.C. § 5324. The defendants are also charged under 18 U.S.C. § 371 with

---

1. Basically, that regulation prohibits, among other things, the sale of salmon eggs from certain species of salmon taken from Lake Ontario, its tributaries and the St. Lawrence River, except that "sport fishermen" may sell the same for use as bait. *See* 6 N.Y.C.R.R. § 37.1.

engaging in conspiracies in conjunction with the alleged offense just described.

Defendant George Jackson is currently being represented by George Lowe of the Syracuse, New York law firm of Bond, Schoeneck & King ("BS & K"). The Gehl defendants are currently being represented by Richard Zuckerman of the Detroit, Michigan law firm of Honigman Miller Schwartz and Cohn ("the Honigman law firm"). Presently before the court is a motion by the government to disqualify attorneys Lowe and Zuckerman on the basis that a conflict of interest exists, or at the very minimum, a substantial appearance of such a conflict exists, if these two attorneys are allowed to continue representing their respective clients. Arthur Semetis of the New York City law firm of Plunkett & Jaffe, P.C., who at one point described his firm as "co-counsel" for the two corporate defendants,[2] but who has not formally appeared in this action, is also a subject of the government's disqualification motion.

On March 15, 1994, in addition to hearing oral argument on defendants' motion to dismiss the first six counts of the indictment,[3] the court also heard argument on the government's motion to dismiss all defense counsel. The court reserved decision pending a hearing to explore whether Messrs. Gehl and Jackson fully understood the risks associated with continued representation by their current attorneys in this prosecution. On March 23, 1994, the court conducted such a hearing. At the end of the hearing the court continued to reserve decision with respect to the issue of whether to disqualify attorneys Lowe and Zuckerman. Prompted in part by certain comments Mr. Zuckerman made during these two proceedings, however, the court granted the government's motion to disqualify attorney Semetis and the Plunkett law firm from representing the Gehl defendants, in any capacity, in this case. The court further directed that from that day forward not only Mr. Semetis, but also anyone at the Plunkett law firm, be strictly prohibited from discussing this prosecution with attorney Zuckerman and/or anyone at the Honigman law firm. Included in the court's direction was a prohibition against communications between anyone from the Plunkett law firm and defendant Robert Gehl or anyone acting on his behalf. Mr. Semetis was so advised in writing on March 28, 1994. Letter of Richard Zuckerman to Arthur J. Semetis (Mar. 28, 1994). The court reminds Messrs. Semetis and Zuckerman, as well as their respective law firms, of their continuing obligation to fully comply with this order throughout the duration of this case.

The court has now had the opportunity to fully reflect on the thorny issues which are inherent in any motion to disqualify counsel based on a claimed conflict of interest. These issues are particularly acute where, as here, the court must balance the defendants' Sixth Amendment right to counsel with the interests of the government, the witnesses and the integrity of the judicial process as a whole. With the exception of Arthur Semetis just discussed, for the reasons set forth herein, the court finds that defendants Gehl and Jackson should be allowed to proceed with their chosen counsel; and consequently, the government's motion to dismiss must be denied in that respect.

## BACKGROUND

The government's theory of disqualification differs as to each defense counsel. Therefore, the court will separately outline the facts and circumstances surrounding each defense counsel's representation of their respective clients to date. Also, given the inherently fact intensive inquiry which is essential to any motion to disqualify, the court will painstakingly review the record before it on this motion. From there the court will go on to consider, in light of the applicable case law, whether those circumstances warrant the drastic remedy of disqualification. *See United States v. Locascio,* 6 F.3d 924, 935 (2d Cir.1993) ("Although disqualification is a drastic measure, the district court is in the best position to evaluate what is needed to ensure a fair trial.").

---

**2.** *See* Government's exh. 3.

**3.** The court's memorandum-decision and order with respect to that matter is being filed concurrently herewith.

### I. Claimed Conflict Re: Attorney Lowe

Prior to the return of the indictment in this case, during the investigative period, a government case agent wanted to interview Robert Maynard. Mr. Maynard, a former New York State employee, had been a manager of a State salmon fish hatchery. It is the government's theory that Mr. Maynard was bribed by defendant Tempotech "in exchange for allowing it access to New York State owned salmon eggs, which ultimately were turned into some of the illegal caviar at issue in the indictment." Memorandum of Law in Support of Motion to Disqualify Counsel Due to Conflicts of Interest ("Government's Memorandum") at 2. Mr. Maynard declined to be interviewed without counsel, though, so in January 1993, he obtained Richard Graham, of BS & K. At the time Mr. Graham was an associate in BS & K's Watertown, New York office. Since then, as of February 1, 1994, BS & K's Watertown office has been closed and Mr. Graham has become associated with another law firm. Affidavit of George Lowe (Feb. 14, 1994) at ¶ 2.

Insofar as his dealings with Mr. Graham are concerned, George Lowe of BS & K avers that after Mr. Maynard retained Graham, Lowe had "one or perhaps" two conversations with Graham. Id. During those conversations, Graham was seeking "guidance in protecting Maynard's interests in negotiations with the United States Attorney." Id. Mr. Lowe further avers that he has "no recollection of the conversation or conversations," although he does remember that he was told that the case pertained to the allegedly illegal sale of caviar. Id. Lowe estimates that the total time spent in conversation with attorney Graham did not exceed ten minutes. Id. at ¶ 3. Mr. Lowe did not charge for his time on this matter; nor has he personally met or spoken with Mr. Maynard. Id. Finally, Lowe has never seen Graham's office file on Mr. Maynard. Id. All of the foregoing occurred while Mr. Graham was still associated with BS & K.

Eventually, on February 25, 1993, Maynard was interviewed by the case agent. Attorney Graham was present throughout and the government agreed, in accordance with Fed.R.Crim.P. 11(e)(6), that any information obtained during that interview could not later be used against Mr. Maynard if he were to be indicted. The government deems the information Mr. Maynard provided during this interview to be "substantial." Government's Memorandum at 2. In the government's opinion that information "will cause damage to the defendants, including George Jackson." Id. Not surprisingly then, the government intends to call Mr. Maynard as a witness at trial.[4]

While negotiating with attorney Graham to secure Maynard's cooperation in being interviewed, AUSA Benedict spoke with attorney Lowe on a completely unrelated matter. Id. at 2. When Benedict happened to mention that he was involved in an environmental case where another BS & K attorney represented one of the witnesses, Mr. Lowe indicated that he knew the identity of that attorney, and that he was also aware of the subject matter of that investigation. Id. From this, Benedict surmised, correctly as it turns out, that Graham had spoken to Lowe to ensure that Maynard was sufficiently protected in agreeing to be interviewed by the government in this case.

Eventually, in August, 1993, Mr. Lowe was

---

4. The details of Mr. Maynard's purported testimony are set forth in the sealed affidavit of Assistant United States Attorney ("AUSA"), Craig Benedict, on file with the court. See Docket Entry #31. In opposing this motion, several times defendant Jackson requested that he be allowed to examine the contents of this sealed affidavit. Without being able to do so, defendant Jackson maintains that he would not be in a position to make an informed decision as to whether to waive his right to conflict-free counsel. The court is sympathetic to defendant Jackson's situation. Especially after reviewing the contents of this affidavit though, in combination with having the opportunity to question Jackson itself and to observe his demeanor, the court adheres to its prior decision that it is not necessary for defendant Jackson to review that sealed affidavit in order to make a knowing and intelligent waiver of his right to conflict-free representation. In any event, defendant Jackson can take some solace in the fact that the contents of Benedict's affidavit do not figure prominently in the court's decision here today.

retained by defendant Jackson.[5] Initially, Lowe failed to make any connection between Jackson and Lowe's earlier conversations with Graham. *Id.* at ¶ 4. Later that month, after Lowe told Benedict that he had been retained to represent Mr. Jackson, Benedict promptly reminded Lowe of Graham's prior representation of Maynard, a government witness. *Id.* Presuming that there "was a connection between Maynard and Jackson," Lowe responded that he would remove himself from the case. *Id.*

Lowe then advised defendant Jackson of his intention to withdraw as counsel. *Id.* at ¶ 5. Protesting, defendant Jackson told Lowe that he had never heard of Maynard. *Id.* After that, Lowe asked attorney Graham to inquire of Maynard as to Maynard's relationship with defendant Jackson. *Id.* Graham did that and advised Lowe that, likewise, Maynard had never heard of Jackson. *Id.* In light of the foregoing, both orally and in writing, Lowe raised the potential conflict of interest concerns with Jackson. *Id.* Jackson still insisted that he wanted to continue being represented by Mr. Lowe, and the government was so advised on August 26, 1993. *Id.* From that time to this, Mr. Lowe has been involved in all aspects of this case, including pre-trial discovery and pre-trial motions, which have been comprehensive and extensive, consisting of far more than the usual boilerplate omnibus motions so often seen in criminal actions before this court.[6]

On January 18, 1994, approximately four and a half months after being advised that defendant Jackson insisted that Lowe continue to represent him, the government brought the current motion to disqualify Lowe. This aspect of the government's motion is premised upon the theory that "Mr. Graham's detailed knowledge of attorney-client privileged information precludes another lawyer [Lowe] from the same firm [BS & K] from representing a second client [defendant Jackson] with adverse interests." Government's Memorandum at 4. Regardless of what Lowe claims he knows or does not know about Maynard by way of Graham, the government contends that Graham's knowledge of privileged attorney-client information gained through his representation of Maynard, a government witness, is imputed to Lowe, thus requiring Lowe's disqualification.

Prior to oral argument, due to a concern about Graham advising Maynard as to whether he should waive the potential conflict, the government sought immediate court intervention. *See id.* at 5. A court conference was held on January 25, 1994, pertaining solely to that issue. During the conference it was agreed that the court would independently locate another attorney to represent Mr. Maynard solely for the purpose of advising him on the conflict or potential conflict issue and attorney-client privilege implications in relation thereto. The court eventually enlisted the services of attorney William Lynn.[7] In the meantime, after advising Graham of this conference, and directing him not to contact Maynard, Mr. Lowe avers that he has "not at any time had any other discussions with Mr. Graham about Mr. Maynard." Lowe Affidavit at ¶ 7.

At the court's direction, on March 15, 1994, attorney Lynn and Mr. Maynard met to discuss the matter of BS & K representing both a government witness and a defendant in the same criminal matter. Prior to that meeting, AUSA Benedict and attorney Lowe provided Lynn with their respective positions on the potential conflict of interest. *See* Court exh. 1 (Letter of William F. Lynn to Court (March 21, 1994)). Following that meeting, Mr. Lynn informed the court in writing as to

---

**5.** Mr. Lowe is not the first attorney to represent defendant Jackson in this matter. Jackson's first attorney was eventually forced to withdraw when it became evident that he was also representing someone who has since become an immunized witness for the government in this case. After that, in early August, 1993, attorney Zuckerman advised the government that he and/or Tempotech were trying to locate another attorney to represent Jackson. Government's exh. 2. Short- ly thereafter, Lowe was retained to represent defendant Jackson.

**6.** It should be noted however that for the most part these voluminous motion papers were prepared by counsel for the Gehl defendants, and defendant Jackson has simply joined in the same.

**7.** The court is grateful to Mr. Lynn for his able and prompt assistance in this matter.

the outcome.[8] In short, Mr. Maynard is satisfied with the representation he has received from attorney Graham, and for the moment is continuing to be represented by him.[9] Mr. Maynard most emphatically is not, however, "willing to waive any attorney-client privilege." *Id.* Significantly, Mr. Maynard has not joined in the government's motion to disqualify attorney Lowe.

## II. Claimed Conflict Re: Attorney Semetis

For whatever reasons,[10] during the course of oral argument and the hearing on this matter, attorney Zuckerman, in his own words, agreed to "throw Mr. Semetis to the wolves." Put less graphically, Zuckerman essentially agreed that Mr. Semetis should be precluded from continuing to represent the Gehl defendants in this case, in any capacity; and, as mentioned earlier, Semetis already has been advised informally of that fact. Thus, a detailed account of Mr. Semetis' prior involvement in this case might not seem necessary at this juncture. Nevertheless, the specifics of Semetis' prior representation of two immunized government witnesses is still important because the government posits that Zuckerman should be disqualified on a theory of imputed taint; that is that Semetis' contamination should be imputed to Zuckerman.

Mr. Semetis' perhaps unwitting representation of two former Tempotech employees, Robin Maynard (daughter of Robert Maynard) and Suzanne Trumble, arose out of the fact that from time to time over the years the Plunkett law firm has served as Tempotech's

corporate counsel. In late October, 1992, Mr. Semetis was told by one of his partners, who had previously represented Tempotech, that some of Tempotech's employees had been contacted by the New York State Department of Environmental Conservation ("DEC"). Affirmation of Arthur J. Semetis (Feb. 14, 1994) at ¶ 4. Semetis' partner then asked him to inquire as to the nature of the government's investigation and "to determine whether Tempotech or any of its employees were subjects or targets of the investigation." *Id.*

Thereafter, Mr. Semetis spoke with Ms. Maynard and Ms. Trumble. The conversation with Ms. Maynard took place on approximately October 29, 1992, by phone. *Id.* at ¶ 5. They discussed Ms. Maynard's employment with Tempotech and the substance of her interview with the DEC investigator, which had taken place just three days earlier. *Id.* Mr. Semetis avers that he was trying to determine, as he had been asked to do, "the nature of the government's investigation, and who, if anyone, was the subject or target of [this] investigation." *Id.*

At about that same time, Mr. Semetis also spoke with the DEC investigator who had talked with Ms. Maynard. Semetis advised the investigator that he represented Tempotech and its employees. *Id.* at par. 6. He further advised the investigator "that if it appeared that a conflict of interest existed, our firm would withdraw its representation of Ms. Maynard." *Id.* Shortly thereafter a potential conflict did arise in that the investigator identified Tempotech as a target of the investigation. *Id.* Therefore, Ms. Maynard

---

8. Messrs. Benedict, Lowe, and Maynard were also provided with a copy of that letter.

9. In attorney Lynn's letter he mentions in closing that he and Mr. Maynard are still discussing the possibility, suggested by Lynn, of Mr. Maynard meeting with yet another attorney to "discuss his current status . . ., if he is the least bit uneasy about continuing with Mr. Graham." Lynn Letter. The court has heard nothing from either attorney Lynn or Mr. Maynard since that letter, and thus assumes that, by choice, Maynard continues to be represented by attorney Graham.

10. Perhaps Mr. Zuckerman saw the handwriting on the wall insofar as the disqualification of Mr. Semetis was concerned. In *United States v. Lo-*

*cascio*, 6 F.3d 924 (2d Cir.1993), the Second Circuit listed several "typical" scenarios where disqualification is "necessary," including "because of the counsel's prior representation of a witness or co-defendant[.]" *Id.* at 931 (citing *United States ex rel. Stewart v. Kelly*, 870 F.2d 854, 856 (2d Cir.1989)); *see also United States v. Allen*, No. 93–0360–01, 1993 WL 533165, at *1, 1993 U.S. Dist. LEXIS 18204, at *4 (E.D.Pa. Dec. 22, 1993) (attorney disqualified where he "appear[ed] to have represented two government witnesses and his present client, [criminal] defendant Allen, concerning ostensibly the subject matter of the present charges as well as in other matters[]"). It is precisely that basis upon which the government moved to disqualify Mr. Semetis.

was given the opportunity to retain separate counsel, at Tempotech's expense. Semetis then contacted Joseph Fahey of the Syracuse, New York law firm of Wiles & Fahey about representing Ms. Maynard. On November 4, 1992, Tempotech confirmed that it would pay for Ms. Maynard's representation by that firm. *Id.*

The circumstances set forth in Mr. Semetis' affirmation as to his contacts with Ms. Trumble are not as detailed as those regarding Ms. Maynard. After speaking with Ms. Maynard, the same DEC investigator contacted Ms. Trumble. *Id.* at ¶ 7. After that, Semetis spoke with Ms. Trumble, "to ascertain certain background information[,]" although Semetis does not elaborate on the nature of that information. *See id.* As with Ms. Maynard, shortly thereafter a potential conflict also became evident. Mr. Semetis therefore advised Ms. Trumble of the same and of Tempotech's offer to pay for separate counsel for her. *Id.* On approximately November 10, 1992, the Wiles & Fahey law firm was also retained, at Tempotech's expense, to represent Ms. Trumble.[11] *Id.*

Mr. Semetis maintains that "[d]uring the course of my preliminary discussion with Ms. Maynard and Ms. Trumble, no privileged information was obtained." *Id.* at ¶ 8. By the same token, however, he further affirms that he "obtained ... their [Ms. Trumble and Ms. Maynards'] employment background and the substance of their interviews by the government agents." *Id.* Mr. Semetis decisively affirms that he "never" relayed to Mr. Zuckerman the "limited information" he received from Maynard and Trumble. *Id.* In fact, it was not until he received this motion to disqualify that he even informed Mr. Zuckerman that the Plunkett law firm had represented Maynard and Trumble for a short time at the beginning of this investigation. *Id.*

It should come as no surprise, given the court's prompt decision to disqualify Mr. Semetis, that the scope of his involvement in this case was not limited to the activities just outlined. In a series of letters, which are part of the record, it is apparent that at least as early as December 31, 1992, Mr. Semetis was actively involved in representing the interests of the Gehl defendants. *See* Government's exhs. 3–9. In fact, in one letter Mr. Semetis expressly states that "we [the Plunkett law firm] serve as co-counsel to Tempotech ... and Gehl Productions...." Government's exh. 3. Mr. Semetis confirmed that fact approximately five months later when he wrote to AUSA Benedict, explaining, "[t]his firm continues to represent Tempotech Industries, Inc., Robert Gehl and Gehl Productions, Inc. in the instant action,...." Government's exh. 9. It is the combination of **all** of these activities which most likely led the government, and eventually Mr. Zuckerman, to conclude that the court had no choice but to disqualify Mr. Semetis because of his prior representation of two government witnesses.

### III. Claimed Conflict Re: Attorney Zuckerman

In December, 1992, the Gehl defendants retained Richard Zuckerman and one of his partners[12] to represent them in conjunction with this prosecution. Affirmation of Richard E. Zuckerman (Feb. 14, 1994) at ¶ 4. This is not the first time that Mr. Zuckerman has represented the Gehl defendants. During the last five years, he has represented them on a variety of corporate matters. *Id.* at ¶ 3. Although Mr. Zuckerman was aware when he was retained by the Gehl defendants in this case that Mr. Semetis had "performed some services for Tempotech in relation to this matter," he did not know that Semetis had represented Ms. Maynard and Ms. Trumble for a while at the start of the investigation. *Id.* Furthermore, according to Mr. Zuckerman, "Mr. Semetis has never shared any information he learned from his representation of Tempotech employees with me."

---

11. By the way, the record is not clear as to whether Ms. Maynard and Ms. Trumble are still being represented by Wiles & Fahey, whether they have since retained other counsel, or whether they have elected to proceed without counsel altogether.

12. That partner has since left the Honigman firm and is not in any way a subject of this motion.

*Id.* Mr. Zuckerman vehemently reiterated this point several times during the course of oral argument and at the subsequent hearing. Notwithstanding the foregoing, the government contends that Mr. Zuckerman must also be disqualified because the taint attributable to Semetis, due to his prior representation of two government witnesses, must be imputed to Zuckerman, even though Zuckerman and Semetis are not members of the same law firm. Their close association through the early stages of the case, spanning approximately fourteen months, in the government's opinion demonstrates, at a bare minimum, that Zuckerman possibly gained access to confidential privileged information, and as such he too must be disqualified.

There is one additional factual element and that is that the record includes an affidavit from Ms. Trumble wherein she plainly avers, "[g]iven the fact that I anticipate being called as a witness by the prosecution I do **not** wish to have Mr. Semetis, his law firm, **or any attorney who worked in conjunction with him on the defense of Tempotech to cross-examine me at trial.**" *Id.* at ¶ 4 (emphasis added). She therefore refuses to "waive any conflict of interest which seems to exist by both Mr. Semetis' continued representation of Robert Gehl and Tempotech after representing me, **and the representation of Richard Zuckerman,** who, I understand, has worked as co-counsel with Mr. Semetis as part of a defense team." *Id.* (emphasis added). Robin Maynard provided no such affidavit. As with Mr. Maynard, neither of these two prosecution witnesses joined in the government's disqualification motion, however.

### DISCUSSION

Before turning to the merits, there are two preliminary matters which deserve comment—the timing of this motion and the government's motive for bringing it.

### I. Timing

The government fully acknowledges that it has an obligation to bring a disqualification motion such as the present one at an early stage of the proceeding. *See United States v. Iorizzo,* 786 F.2d 52, 59 (2d Cir.

1986) (admonishing prosecutors that when they are aware early on of a defense counsel's conflict of interest, a motion for pretrial disqualification should be made, instead of attempting to use such conflict to affect evidence presented to jury). In fact, at least one court has recognized that the government's failure to promptly bring a motion to disqualify undermines the claim for such relief, and "suggests that such motion is being brought merely for 'strategic' reasons." *See Adler & Shepard v. Script Systems, Inc.,* 91–CIV–2019, 1992 WL 51499, at *4 n. 3, 1992 U.S. Dist. LEXIS 2746, at *7 n. 3 (S.D.N.Y. Mar. 9, 1992); *but see United States v. Falzone,* 766 F.Supp. 1265, 1273 (W.D.N.Y.1991) (court expressed concern with nearly one year delay between time indictment returned and filing of disqualification motion, but found defendant not prejudiced by such delay). In the present case, the government became aware of Mr. Lowe's intention to continue representing defendant Jackson in late August, 1993, but it did not bring this motion until approximately four and a half months later. With respect to attorney Zuckerman, although he and AUSA Benedict had numerous conversations between December, 1992 and January, 1994, it was not until the government filed the present motion in mid-January, 1994, that Mr. Zuckerman became aware that the government perceived there to be a conflict due to Zuckerman's "choice of Mr. Semetis as local counsel in this case." *Id.* at ¶ 5.

What is more, the government was clearly aware of a potential conflict as to Mr. Semetis as early as April 16, 1993, approximately eight and a half months prior to the filing of this motion, when it so advised Mr. Semetis in writing of its concern. Government's exh. 8. At that time, both Suzanne Trumble and Robin Maynard were immunized government witnesses, and the government aptly framed the potential conflict as follows: "Both individuals are now immunized witnesses for the United States and if a trial is ultimately necessary you would be called upon to cross examine (or assist others in preparing to cross examine) your former clients." *Id.* Even with this knowledge in April, 1993, the government did not bring this motion until

January 18, 1994. The government's failure to more promptly bring this motion does not, however, require denial of the same, especially considering the lack of prejudice to the defendants caused by this delay. While the defendants' objections to this motion are many, prejudice due to delay is not one of them. Moreover, in light of plea discussions which probably detracted from the urgency of this motion, giving the government the benefit of the doubt, perhaps it was not in a position to move any sooner than it did.

### II. Motive

■ In addition, the court does not find, as the defendants strongly imply, that this delay gives rise to an inference that the government manufactured the asserted conflicts or potential conflicts. The Gehl defendants describe the government's motives as "particularly suspicious" because of the delay between the time the government first acknowledged in writing the potential conflict regarding Mr. Semetis and the time the disqualification motion was filed. The Gehl defendants also point to the fact that the government did not file this motion until after Zuckerman, on their behalf, had "filed substantive and lengthy motions that required the Government to work over the December holidays." Gehl Defendants' Memorandum at 10. In the court's view, however, neither of these circumstances gives rise to an inference that the government is attempting to manufacture a conflict to prevent any of these defendants from being represented by especially able defense counsel. *See Falzone, supra,* 766 F.Supp. at 1273. As the government noted at oral argument, even if the court were to disqualify all defense counsel, the government would not gain a tactical advantage from the standpoint that as replacement counsel the defendants would undoubtedly retain equally well qualified defense lawyers. Thus, the court is not persuaded that this motion was brought for an improper purpose.

### III. Legal Standards

■ The starting point for any motion to disqualify defense counsel in a criminal case is the Sixth Amendment. Under the Sixth Amendment, a criminal defendant enjoys "the right . . . to have the assistance of counsel for his defence." U.S. Const. amend. VI. In the leading case of *Wheat v. United States,* 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988), however, the Supreme Court recognized that this right does not encompass the absolute right to counsel of the defendant's own choosing. "[W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Locascio, supra,* 6 F.3d at 931 (citing *Wheat,* 486 U.S. at 159, 108 S.Ct. at 1697). Relying upon *Wheat,* the Second Circuit in *Locascio* further explained, "although a criminal defendant can waive her Sixth Amendment rights in some circumstances, that right to waiver is not absolute, since 'federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.'" *Id.* (quoting *Wheat,* 486 U.S. at 160, 108 S.Ct. at 1698) (emphasis added). Thus, disqualification of criminal defense counsel requires courts to balance competing interests, as the Second Circuit acknowledged again recently: "The question of disqualification therefore implicates not only the Sixth Amendment right of the accused, but also the interests of the courts in preserving the integrity of the process and the government's interests in ensuring a just verdict and a fair trial." *Id.* (citing *Wheat,* 486 U.S. at 160, 108 S.Ct. at 1698).

In balancing these competing interests, a presumption arises in favor of the accused's chosen counsel. *Id.* (citing *Wheat,* 486 U.S. At 164, 108 S.Ct. at 1699) (other citation omitted). "[T]his presumption can be overcome by a showing of an actual conflict or potentially serious conflict." *Id.* With these general principles firmly in mind, the court will now turn to an examination of the claimed conflicts or potential conflicts with respect to attorneys Lowe and Zuckerman.

## IV. Waiver

At oral argument, it became clear that both defendants Gehl and Jackson might want to waive their right to be represented by conflict-free counsel. The Second Circuit "has recognized that even when a constitutional defect exists, which would arise only when an actual conflict exists, 'waiver by the accused of the conflict can conceivably alleviate the constitutional defect, so long as the representation by counsel does not seriously compromise the integrity of the judicial process.'" *United States v. Rahman*, 837 F.Supp. 64, 70 (S.D.N.Y.1993) (quoting *Locascio, supra*, 6 F.3d at 933–34)). So, as previously mentioned, on March 23, 1994, the court conducted a hearing to address the waiver issue. Because a district court cannot casually accept a waiver of this nature, as directed by the Second Circuit, this court "[a]dvise[d] the[se] defendant[s] of the danger arising from the particular conflict; ... determine[d] through questions that [we]re likely to be answered in narrative form whether the defendant[s] underst[oo]d[ ] those risks and freely cho[ ]se[ ] to run them; and ... g[a]ve the defendant[s] time to digest and contemplate the risks after encouraging [them] to seek advice from independent counsel." *United States v. Rogers*, 9 F.3d 1025, 1031 (2d Cir.1993) (citing *United States v. Iorizzo*, 786 F.2d 52, 59 (2d Cir. 1986) (citation omitted)).

### A. Defendant Jackson

■ Through questioning Mr. Jackson in accordance with the above the court elicited the following pertinent information. Mr. Jackson is forty-five years old; he has had no formal education beyond seventh grade. He is currently employed as Tempotech's general manager and he has been with that company for the past five years. Mr. Jackson indicated that he fully understood the nature of the hearing, and, more importantly, that he was fully aware of the ramifications of continuing to be represented by BS & K attorney Lowe, at the same time a government witness, who allegedly will implicate him in some fashion, is being represented by another attorney, formerly of BS & K. Mr. Jackson exhibited both to the court and to the government, in response to an explicit inquiry by AUSA Benedict, that he fully understands that attorney Lowe's continued representation of him may preclude attorney Lowe from fully cross-examining Mr. Maynard at trial. More specifically, Mr. Jackson is keenly aware that attorney Lowe's ability to fully cross-examine Maynard may be circumscribed by the fact that Lowe cannot use any privileged information he may have received from Graham. With full knowledge of that, nonetheless, Mr. Jackson still insists on being represented by Mr. Lowe, and unequivocally waived his right to present and future conflict-free representation in this case. Even in the face of persistent inquires from the court, and when fully advised of the fact that Mr. Maynard is not willing to waive any attorney-client privilege, Mr. Jackson remained steadfast in his desire to continue being represented by Mr. Lowe.

During the hearing the court was struck by the fact that Mr. Jackson's responses were not off-the-cuff, but thoughtful and obviously the result of much deliberation. As alluded to earlier, this delicate issue did not first come to defendant Jackson's attention on March 23, 1994. Rather, in the months prior to this motion, it had been the subject of much discussion between he and attorney Lowe, as well as the subject of some correspondence. Mr. Jackson did indicate, however, that he did not discuss this conflict issue with counsel other than Mr. Lowe. Satisfied with the discussions he and Mr. Lowe have had, though, defendant Jackson informed the court that he is not interested in getting a second opinion from a different lawyer. Overall, at the conclusion of Mr. Jackson's testimony, the court was left with the impression that despite his lack of formal education, Mr. Jackson is an intelligent person, who is perfectly capable of making decisions regarding his own affairs, including the decision as to whether or not to continue being represented by attorney Lowe in this matter. Consequently, the court finds that under all of the circumstances defendant Jackson has made a knowing and intelligent waiver of his right to conflict-free representation under

the Sixth Amendment.[13]

## B. *Defendant Gehl*

■ The court questioned Mr. Gehl in the same manner as it did Mr. Jackson. Mr. Gehl is a fifty-three year old business person. He has a master's degree in international trade and is the president of both defendant corporations—Tempotech and Gehl Productions. Mr. Gehl founded the former company in 1970; the latter was more recently formed by him approximately three to four years ago. Prior to the hearing, Mr. Gehl and attorney Zuckerman had fully discussed not only the purpose of the hearing, but Gehl's Sixth Amendment right to be represented by conflict-free counsel, i.e. counsel having no divided loyalties. In that regard, Mr. Gehl indicated that he understands the purpose of cross-examination and its importance to his defense herein.

Mr. Gehl further testified that he fully understands the conflict issues relating to Mr. Semetis, and the government's contention of "imputed taint" insofar as Mr. Zuckerman is concerned. In response to a direct inquiry from the court, Mr. Gehl stated that despite Semetis' involvement, it was his understanding that this is "completely" Mr. Zuckerman's case. Mr. Zuckerman has personally represented Gehl and Tempotech for

the past eleven years and Mr. Gehl candidly stated, "I guess I'm very comfortable with this relationship." Although Mr. Gehl and Mr. Zuckerman apparently discussed the potential conflict concerns here at length, at the time of the hearing, Mr. Gehl had not discussed them with any other lawyer. The court thus gave Mr. Gehl permission to consult with another lawyer on this issue, and he did that. The court also advised Mr. Gehl of Suzanne Trumble's affidavit, but that it was unaware as to the position Robin Maynard is taking with respect to this disqualification motion.

At the hearing, Mr. Gehl came across as a well educated, articulate and savvy business person. Given his formal education, and the many years he has spent in the business world, including international business, in combination with his overall demeanor during the hearing, Mr. Gehl too strikes the court as a person who is perfectly capable of making decisions effecting his own affairs, including the decision as to whether or not to continue being represented by attorney Zuckerman in this matter. The court therefore finds that based upon all of the facts before it, defendant Gehl has made a knowing and intelligent waiver of his right to conflict-free representation under the Sixth Amendment.[14]

13. The government contends that the court should not accept Jackson's waiver as being knowing and intelligent because he does not know the full extent of Mr. Maynard's testimony against him. *See* Letter of AUSA Benedict to Court (Mar. 28, 1994) at 2. This argument is disingenuous at best given the government's adamant refusal to provide defendant Jackson with AUSA Benedict's sealed affidavit, which discusses generally Maynard's supposed testimony.

14. The court notes in passing that the government seems to place much credence in Magistrate Judge DiBianco's decision in *In Re: Grand Jury Investigation # 19*, Misc. No. 2637 (N.D.N.Y. Dec. 7, 1990), wherein he refused to accept the waivers of four targets of a grand jury investigation who were being simultaneously represented by the same law firm. *See* Government's exh. 12. Based in part upon that case, the government urges the same result here—that the court refuse to accept the waivers of defendants Gehl and Jackson. The court declines to reject these waivers on the basis of *Investigation # 19*, however. The factual distinctions between that case and the present one are numerous. The close relationship there between the four targets did

not end with their shared legal representation. They were all employed by the same company, which was itself a target of the investigation; that company paid for the targets' legal fees; there was close communication between all four targets regarding the subject matter under investigation; and each of the four targets was in possession of relevant information about the others. Accordingly, given the striking differences between that case and the present one, the court does not find *Investigation # 19* determinative on the issue of whether to accept the waivers of defendants Gehl and Jackson herein.

Before leaving this waiver issue, the court offers the following observation. Given its acceptance of the waivers from defendants Gehl and Jackson, they are forewarned, as suggested during the hearing, that "it would be a rare case in which a defendant, after convincing the trail court not to disqualify his attorney of choice, should be able to obtain a reversal of his conviction on the basis of a conflict of interests." *See United States v. Pungitore*, 910 F.2d 1084, 1143 n. 84 (3rd Cir.1990), *cert. denied*, 500 U.S. 915, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991); *see also United States v. Moscony*, 927 F.2d 742, 749 n. 10

As earlier implied, these waivers by defendants Gehl and Jackson cannot end the court's inquiry, as the defendants all seemed to suggest at one point or another. In *Wheat* the Supreme Court explicitly rejected the notion that a waiver by an affected defendant could cure all problems created by multiple representation; and in so doing, noted that "no such flat rule can be deduced from the Sixth Amendment presumption in favor of counsel of choice." 486 U.S. at 160, 108 S.Ct. at 1697. Thus, as mentioned earlier, the court's acceptance of the defendants' waivers in this case does not obviate the court's "independent duty to ensure that criminal defendants receive a trial that is fair." *Id.* As part of this balancing process the court must also take into account the government's interest in "protecting its witnesses from tactics that are unfair[.]" *See Falzone, supra,* 766 F.Supp. at 1275 (quoting *United States v. James,* 708 F.2d 40, 46 (2d Cir.1983)). This balancing approach places the court in an unenviable position, as so cogently explained by Judge Mukasey in *Rahman:*

> [T]he cases cited offer scant guidance for district courts in the exercise of the wide discretion *Wheat* affords, beyond directing that they apply a presumption in favor of counsel of choice (*Wheat*) and permitting but not requiring them to accept waivers of actual conflict unless to do so would seriously compromise the integrity of the judicial process (*Locascio*). These authorities define no easily articulated rule, and appear to require not only the weighing of interests neither precisely measurable nor easily compared (positively weighted value of defendants' choice balanced against integrity of the judicial process), but also the evaluation of relationships that are not now clear ... and an augury of a future that cannot be certain....

837 F.Supp. at 70 (footnote omitted). Although *Rahman* was a joint representation case, it is, nonetheless, an accurate description of the position in which this court now finds itself.

In the present case, even accepting defendant Jackson's waiver, the government vehemently maintains that there is an "actual conflict," or, at the very least, a "potentially serious conflict" such that Mr. Lowe should be precluded from representing defendant Jackson. To highlight once again that asserted conflict, as depicted by the government, a former BS & K client, Robert Maynard, will be called upon to testify against a current BS & K client, defendant Jackson, thus significantly impairing Lowe's ability to effectively cross-examine Mr. Maynard. The government further contends that unless ·Maynard also supplies a waiver, which plainly he has not, then attorney Lowe still must be disqualified. In response, Jackson claims that the ability of his chosen counsel, attorney Lowe, to effectively cross-examine Paul Maynard will not be inhibited in any way because Maynard has never heard of Jackson "and presumably will not even mention his name while testifying." Defendant Jackson's Memorandum at 5.

To support its position that an actual conflict exists in Lowe's continued representation of defendant Jackson, the government relies heavily upon several cases, including *Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225 (2d Cir.1977), *Hull v. Celanese Corp.,* 513 F.2d 568 (2d Cir.1975) and *Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562 (2d Cir.1973). The government is correct that the general rule which emerges from those cases is that when one attorney is contaminated with privileged information, the other attorneys at the firm are also presumed to be contaminated, leaving them vulnerable to a motion to disqualify, even though they did not originally receive the privileged information. For example, in *Fund of Funds,* plaintiff's counsel was disqualified because he was in a position to obtain privileged information in that his firm had represented the defendant in a factually related case. In *Hull,* which the Second Circuit described as factually "novel," the issue was "whether a law firm can take on, as

---

(3rd Cir.), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2812, 115 L.Ed.2d 984 (1991) (citation omitted) ("This is certainly not to imply that if the district court accepts the waiver the defendant may later

successfully complain about a conflict of interest."). Thus, defendants' waivers here may well be at a high price in terms of future appeals, if any.

a client, a lawyer for the opposing party in the very litigation against the opposing party." 513 F.2d at 569. The Court answered that question in the negative. In a similar vein, the court in *Emle* held that plaintiff's counsel was properly disqualified in a patent declaratory judgment action where he had previously represented a part owner of the defendant corporation in prior litigation involving the exact same issue as was being litigated in the subsequent declaratory judgment action. In reaching that conclusion, the *Emle* Court went so far as to state that even the most rigorous self-discipline on the part of the infected attorney might not prevent him or her from unconsciously exploiting confidential information. *Emle Industries, supra,* 478 F.2d at 571.

Despite the fact that in each of the three cases just discussed the courts found disqualification proper, this court is not convinced that the same result is required here. One obvious and important distinction between those three cases and the present one is that they all involved disqualification in the civil context where no Sixth Amendment implications arise. And although that is not a reason to dismiss the teachings of those cases out-of-hand, as defendants urge, it does diminish their relevance, particularly, as will be discussed, in light of far more recent Second Circuit criminal disqualification cases. Moreover, the court was unable to unearth a single reported criminal case which relied upon any of those three cases to support a finding that disqualification was mandated. Thus, while it might be tempting at first glance to conclude, as did the government, that attorney Lowe should be disqualified because he might have been privy to confidential information via attorney Graham, the court cannot take such a simplistic approach to this motion which, perhaps more than any other, so greatly effects these defendants.

Having said all that, the court will now focus on balancing the various competing interests at stake here. Aside from mentioning the court's duty, from an institutional standpoint, to uphold the integrity of the criminal justice system as a whole, and a fleeting reference to protecting Mr. Maynard from unfair trial tactics, the government has not articulated any concrete reason as to how it will be prejudiced by Lowe's continued representation of defendant Jackson. Furthermore, Mr. Maynard, a former BS & K client, has not joined in the government's motion to disqualify Lowe. Therefore, presumably he does not "view[ ] the risk of an intrusion into his attorney-client privilege as substantial enough to seek disqualification." *See Falzone, supra,* 766 F.Supp. at 1273. In fact, in *United States v. Cunningham,* 672 F.2d 1064 (2d Cir.1982), one of the reasons the Second Circuit reversed defense counsel's disqualification was that the former client, a government witness, failed to join in the government's motion. *Id.* at 1072.

The parties herein devoted much discussion to the significance of *Cunningham* in light of subsequent Second Circuit case law. *Cunningham* undeniably has continuing vitality in at least one important aspect, however, and that is the Court's recognition, just recently reaffirmed by the Second Circuit in *Rogers,* that:

Our observation in *United States v. Cunningham,* 672 F.2d 1064, 1072 (2d Cir. 1982), is equally pertinent here:

No case has been called to our attention, and we are aware of none, in which an attorney has been disqualified on grounds of conflicting prior representation solely at the behest of a person other than the former client or its privy.... '[A]s a general rule, courts do not disqualify an attorney on the grounds of conflict of interest unless the former client moves for disqualification.' **The refusal to disqualify in the absence of a motion by the former client is all the more appropriate in the context of a criminal prosecution with its implication of constitutional rights.**

*Rogers,* 9 F.3d at 1031 (emphasis added) (quoting *Cunningham, supra,* and quoting in turn *In re Yarn Processing Patent Validity Litigation,* 530 F.2d 83, 88 (5th Cir.1976) (footnotes omitted)). Consequently, arguably even more so after *Rogers,* Mr. Maynard's failure to join in the government's disqualification motion is a factor which strongly militates against a finding that disqualification of attorney Lowe is mandated.

The government's overriding concern here is that a potential conflict could arise if Lowe were called upon to cross-examine Maynard and in so doing used privileged information obtained through Graham, thus giving defendant Jackson a tactical advantage, as well as significantly undermining Maynard's attorney-client relationship with Graham. This potential conflict seems more imagined, or at least speculative, than real however. It does not appear to the court, at least at this juncture, that the government's case against any of these defendants, and George Jackson in particular, hinges upon the testimony of Mr. Maynard. *Contra Moscony, supra*, 927 F.2d at 750–751 (defense counsel disqualified because, among other reasons, the "crux" of the government's case might deal with the testimony of that lawyer's former clients). In this respect, the court tends to agree with defendant Jackson's observation that if Maynard's information is as "substantial"[15] and "damaging"[16] as the government contends, then why is it that Maynard did not testify before the grand jury? *See* Lowe Affidavit at ¶ 6. And why is the only information in the government's possession as to Maynard's knowledge of this case a few handwritten notes of AUSA Benedict?[17] *See id.* Even assuming that for strategic reasons the government never prepared any "302's" (summaries of interviews with government agents, such as the Federal Bureau of Investigation) or other interview memoranda in connection with Maynard, it still strikes the court as extremely curious that a witness whom the government now depicts as critical in establishing its case never testified before the grand jury.

In any event, regardless of how Mr. Maynard's purported testimony is characterized, the culmination of all of the facts of this particular situation convinces the court that while there **may** be **potential** for a conflict if attorney Lowe is allowed to continue representing defendant Jackson, that potential is not so serious as to warrant the harsh remedy of disqualification of Jackson's chosen lawyer. As already discussed, defendant Jackson, after being fully apprised of all of the ramifications of Lowe's continued representation, including possible limitations to his defense and to an appeal if he is convicted, still opted to continue with Mr. Lowe as his lawyer, and in so doing expressly waived his Sixth Amendment right to present and future conflict-free counsel in this case. Furthermore, Mr. Maynard elected not to join in this motion by the government. Thus the court is left only with the government's speculative fears that attorney Lowe will cross-examine Maynard about matters to which Maynard claims an attorney-client privilege. Mr. Lowe, as an officer of the court, has informed the court though that he possesses no attorney-client privileged information regarding Maynard. In all likelihood, that alone would not be sufficient to defeat the government's motion,[18] because, among other things, the court must be concerned with "potentially serious conflict[s]," as well as "actual conflict[s]." *See Wheat, supra*, 486 U.S. at 160, 108 S.Ct. at 1698. Given the record as it is presently constituted, however, and exercising the "substantial latitude" given to it when considering a motion to disqualify in the criminal context, *see Locascio, supra*, 6 F.3d at 931 (quoting *Wheat*, 486 U.S. at 163–64, 108 S.Ct. at 1699), the court finds that defendant Jackson is entitled to continue in this case with his chosen counsel, George

---

15. Government's Memorandum at 2.

16. *See id.*

17. The court realizes that the government has only interviewed Mr. Maynard on one occasion, and given the chance, doubtless, the government would respond that that is the reason for the scant documentation regarding the extent of Mr. Maynard's knowledge about the crimes charged in this case. Because the government has only interviewed Maynard once and, by its own admission "does not purport to know the full extent of [his] possible testimony[,]" it seems to the

court then that the timing of the government's motion is once again called into question—only on this occasion because perchance it is premature. *See* Letter of AUSA Benedict to Court (Mar. 28, 1994) at 2.

18. *See Papanicolaou v. Chase Manhattan Bank, N.A.*, 720 F.Supp. 1080, 1086 (S.D.N.Y.1989) (and cases cited therein) ("courts have held that the sworn word of an infected attorney or his or her allegedly uninfected colleague that there was no cross-pollination between them is not a satisfactory rebuttal....").

Lowe. Accordingly, the government's motion to disqualify attorney Lowe is denied.

 Turning next to defendant Gehl, it is interesting to note that during the waiver hearing, the government conceded that whether Gehl's lawyer, Richard Zuckerman, should be disqualified is a "closer call." The government then went on to argue that the appearance of impropriety creates an obstacle to Zuckerman's continued representation of Gehl. The court disagrees, for many of the reasons already articulated in connection with defendant Jackson. First of all, defendant Gehl made a knowing and intelligent waiver of his right to conflict-free representation under the Sixth Amendment. As to defendant Gehl, there is the added consideration that he and attorney Zuckerman have had a satisfactory, longstanding attorney-client relationship of approximately eleven years. *See Cunningham, supra,* 672 F.2d at 1070–73 (Second Circuit reversed lower court's decision to disqualify Cunningham's lawyer due to a conflict of interest between Cunningham and a former client who was to be called to testify against Cunningham, because, *inter alia,* Cunningham had successfully relied upon his attorney for more than six years). Thus, here again, all the court is left with is a potential conflict due to attorney Semetis' prior representation of two government witnesses.

Given the facts of this particular case the court simply cannot accept the government's view of "imputed taint" as to attorney Zuckerman due to Arthur Semetis' previous involvement in this case. As an officer of the court, attorney Zuckerman repeatedly stated, in one form or another, that he does not possess any privileged information regarding either Suzanne Trumble or Robin Maynard. *See, e.g.,* Zuckerman Affidavit at ¶ 4. The court has no reason to doubt Mr. Zuckerman's veracity. Thus, the government's perception that Zuckerman is advantaged because he knows the substance of the government's first interviews with Ms. Trumble and Ms. Maynard appears to be without merit. Insofar as the affidavit of Ms. Trumble is concerned, assuming *arguendo* that there are

no barriers to the court's consideration of the same, it carries little weight because Ms. Trumble is not a former client of Mr. Zuckerman, rather she is a former client of Mr. Semetis, whom the court has already disqualified. Thus, the court finds that the government is also unable to overcome, in this particular instance, the presumption in favor of defendant Gehl's chosen counsel. Therefore, the government's motion to disqualify must also be denied as to attorney Richard Zuckerman.

 In closing the court adds that it is not unmindful of existing precedent, some of which the government referenced, where courts have disqualified defense counsel based on a conflict of interest. *See, e.g., United States ex rel. Stewart on Behalf of Tineo v. Kelly,* 870 F.2d 854 (2d Cir.1989) (disqualification upheld where that attorney had previously represented a prosecution witness). The outcome of any disqualification motion is so fact dependent, however, that even the slightest factual distinction can have a significant impact on the outcome. *See United States v. Sabarese,* 93–389, 1994 WL 118315, at *8, 1994 U.S. Dist. LEXIS 4047, at *26 (D.N.J. March 30, 1994). Thus, in the end, with the case law to serve as a general guidepost, the court is convinced that with respect to both defendants Gehl and Jackson the presumption favoring their choice of counsel has not been overcome "by a showing of an actual conflict or potentially serious conflict." *See Wheat,* 486 U.S. at 160, 108 S.Ct. at 1698. Accordingly, the government's motion to disqualify Arthur Semetis as defense counsel in this case is GRANTED; however, the government's motion to disqualify attorneys George Lowe and Richard Zuckerman is in all respects DENIED.[19]

IT IS SO ORDERED.

---

**19.** Incidentally, as the parties are undoubtedly aware, a pretrial order granting a motion to

disqualify defense counsel in a criminal prosecution is not subject to immediate appeal under 28

U.S.C. § 1291. *Flanagan v. United States,* 465 U.S. 259, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984). More to the point, however, is the fact that in *United States v. Camisa,* 969 F.2d 1428 (2d Cir. 1992), the Second Circuit held that an interlocu-tory appeal was not available where the district court denied the government's motion to disqual-ify defendant's local counsel, who also represent-ed a potential government witness.